## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JOHN THOMAS**                                               **CIVIL ACTION**

**VERSUS**                                                    **NO. 13-39**

**BESSIE CARTER, ET AL.**                                     **SECTION "C" (2)**

### O R D E R

Before the Court are the plaintiff's objections to the United States Magistrate Judge's Report and Recommendation in this case. Rec. Doc. 24. The Magistrate Judge recommends that the Court GRANT defendants' motion for summary judgment and dismiss plaintiff's complaint with prejudice. Rec. Doc. 23. The Court, having considered the complaint, the record, the applicable law, and the Report and Recommendation of the United States Magistrate Judge, hereby SUSTAINS the plaintiff's objections and, therefore, REJECTS the Report and Recommendation of the Magistrate Judge. The Court GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment as set forth below.

### I. Factual Background

By his complaint, plaintiff, a prisoner at Rayburn Correctional Facility, claims that defendants - doctors, nurse, and warden of Rayburn - provided inadequate medical care for his right hip, in violation of Eighth Amendment prohibition against cruel and unusual punishment. Rec. Doc. 1. Plaintiff states this claim particularly, although not exclusively, with respect to his entitlement to receive consultations for hip replacement surgery. Plaintiff claims that he is willing and able to pay for his own hip replacement surgery. *Id.* at 9.

Unless otherwise noted, the following facts have been gleaned from plaintiff's medical records from the Department of Public Safety and Corrections and are not in dispute. Plaintiff is

70 years old. In 1999, he had a tracheostomy ("trach") tube surgically implanted as a result of a layered malignancy in his throat. Rec. Doc. 11-2 at 4. Plaintiff alleges that this malignancy was the result of Agent Orange exposure while he was serving in the Vietnam War. *Id.* Because of the trach tube, plaintiff does not speak; he mouths words or writes them down, when he is allowed a pen and paper. *Id.*

Plaintiff has suffered serious hip problems since before the period of confinement at issue in this case. He was diagnosed with a degenerative hip disease sometime in 2009. *Id.* Plaintiff maintains that on November 24, 2009, he was placed on a list for replacement surgery at LSU Hospital in New Orleans to take place in January 2010 at the latest. *See, e.g.*, Rec. Doc. 1. at 33. For reasons unstated, this surgery did not take place before plaintiff's arrest on drunk-driving charges in September of the same year. *Id.*

On March 14, 2011, plaintiff was convicted for operating a vehicle while intoxicated, fourth offense and remanded to Elayn Hunt Correctional Center. Rec. Doc. 9, ¶ 2. On March 22, plaintiff's physician at Hunt Reception and Diagnostic Center (HRDC), referred him to the Medical Center of Louisiana at New Orleans for care related to his trach tube. Rec. Doc. 11-4 at 23.[1] Although the records of this intake do not reflect specific hip pain complaints, plaintiff was given a year-long, twice-daily prescription for 800 mg of ibuprofen, suggesting that such complaints were made. Rec. Doc. 11-4 at 21, 24, 27. In any case, at a scheduled follow-up appointment on April 1, 2011, plaintiff complained of pain in his hip. Rec. Doc. 11-4 at 21. The treating physician prescribed plaintiff a cane and 800 mg of Motrin, with follow-up care to occur

---

[1] There is no record of this visit having taken place.

2

within two weeks and recommended a change of duty status to prevent plaintiff from standing for more than 10 minutes. *Id.*

On April 12, plaintiff was transferred to C. Paul Phelps Correctional Center, where he was admitted to the medical housing or observation unit for issues related to his trach tube. Rec. Doc. 11-3 at 12, 25. Plaintiff's intake records from Phelps reflect complaints of hip and lower back pain. Rec. Doc. 11-3 at 25. Plaintiff was given a cane and indefinite duty status that prevented standing to work, lifting over 10 pounds, walking over one-quarter miles, and bending, squatting, or goose-picking. Rec. Doc. 11-2 at 3.

The records show that plaintiff led a relatively comfortable life in the medical unit, save two incidents when he ran out of medication. On April 13, 2011, plaintiff went to the nurse's station to complain of pain of right hip pain after his doctor discontinued his twice-daily 800 mg Motrin prescription. Rec. Doc. 11-3 at 12. By April 14, 2011, he rated his pain as 8 out of 10. *Id.* On April 15, 2011, after plaintiff began receiving a new Motrin prescription, he noted that his hip pain was improved, registering only 5 out of 10. *Id.* at 12. One month later, plaintiff's prescription expired, leading to further complaints of hip pain. *Id.* at 16, 22. This time, Dr. John Crawford prescribed 650 mg of Tylenol. *Id.* Plaintiff's progress notes show that until he was discharged on July 6, 2014, he was able to navigate the medical unit with little difficulty and had no complaints of hip pain. *Id.* at 12-16, 18.

Upon discharge from the medical unit, plaintiff was given a different set of restrictions. Rec. Doc. 11-2 at 2. These restrictions did not prevent specific activities, but restricted plaintiff to "dorm duty." *Id.* On July 15, 2011, plaintiff made a sick call for hip pain, stating that he could no longer ambulate comfortably with a cane and requesting a wheelchair. Rec. Doc. 11-4 at 20.

3

The screening nurse ordered 400 mg of Motrin on top of plaintiff's Tylenol prescription and directed a follow-up visit to occur on July 18. *Id.* Notes of the follow-up visit reflect a physician recommendation for a hip x-ray that was subsequently crossed out in pen. *Id.* In his pleadings, plaintiff claims that he was in fact x-rayed at LSU. Rec. Doc. 1 at 54. Offender Correspondence from the Director of Nursing at Phelps dated July 15, 2011 indicates that LSU referred plaintiff to "orthopedics" to be evaluated for his hip problem. *Id.* The records reflect no disposition of plaintiff's request for a wheelchair.

On July 29, 2011, plaintiff made a sick call, stating that the Tylenol was not helping. Rec. Doc. 11-4 at 19. He rated the residual pain he felt between 9 and 10 on a presumably 10 point scale. *Id.* The screening nurse scheduled plaintiff for a doctor's appointment on August 1, 2011 at 8 AM. *Id.* However, on August 1, instead of visiting the doctor, plaintiff was transferred from Phelps to Rayburn Correctional Center.

At Rayburn, plaintiff was evaluated and given temporary recreational restrictions by Dr. Dennis Lavaria, one of the defendants in this case. Rec. Doc. 11-2 at 1. On August 3, 2011, plaintiff made a sick call, stating that he was in pain and on a list for hip replacement surgery. Rec. Doc. 11-4 at 18. The same day he wrote defendant Bessie Carter a letter explaining that he had been placed on a list for hip replacement surgery at LSU Hospital in New Orleans shortly before his incarceration on the present offense. Rec. Doc. 1 at 52. In that letter, he asked that his treatment records from LSU Hospital be released to the Rayburn Medical Staff so that they could "better assess his medical concerns." *Id.* Finally, plaintiff requested to have his duty status at Hunt transferred over Rayburn. *Id.*

On August 8, 2011, plaintiff was seen by Dr. Lavaria. Dr. Lavaria noted that plaintiff had made complaints of hip pain dating back to 2009. Rec. Doc. 11-4 at 17. He ordered x-rays of the plaintiff's hip and prescribed tennis shoes, a cane, and ibuprofen. *Id.* He restricted plaintiff's duty status, confining him to the compound, inside the fence, and the bottom bunk of his cell and restricting him from any assignment that involved lifting over 10 lbs or "prolonged" standing or walking. Rec. Doc. 11-1 at 39.

Thereafter, plaintiff received a letter from Bessie Carter, stating curtly,

[w]e do not make copies of medical records for presently incarcerated offenders according to Departmental regulation #B-06-001 HC#33. You were seen and evaluated by the doctor today and was [sic] given a restrictive status and he ordered x-rays of your hips to be done. It will be up to the doctor whether or not he recommends a referral to an off site physician concerning your hips. Any problems you have you need to address through the proper sick call procedures.
Rec. Doc. 1 at 51.

On or about August 14, 2011, plaintiff was given an x-ray examination at the request of Dr. Lavaria, which revealed "extensive degenerative changes of the hips, right greater than left," with "marked gyral changes" and "narrowing of the joint space." Rec. Doc. 11-2 at 19. The report indicates that it was dictated and authenticated on August 18. *Id.* However, no follow up treatment or diagnostic imaging ordered at this time. On August 17, 2011, plaintiff made a sick call complaining of hip pain and "not getting meds [at] roll call." Rec. Doc. 11-4 at 13. The physician's notes recommend continuation of ibuprofen. *Id.* However, the screener's notes indicate that he or she "checked pharmacy order" and the prescription was "in computer." *Id.* Records show that plaintiff received the orthopedic tennis shoes that he had been prescribed on August 29, 2011. Rec. Doc. 11-4 at 14.

In September 2011, plaintiff received several treatments for conditions unrelated to his hip. Rec. Doc. 11-4 at 8-12. On the 30th, plaintiff submitted an administrative review process ("ARP") complaint related to his hip condition. Rec. Doc. 1 at 55. The complaint stated that treatment delays, together with the lines and standing that he had to endure to obtain pain medication, had resulted in unnecessary pain and worse, deterioration of his hip bone and/or joints. *Id.* This complaint was received on October 3, 2011.

On October 17, 2011, plaintiff made a sick call for a "broken tooth," with some of the tooth remaining in his left gum, and hip pain. Rec. Doc. 11-4 at 5. Notably, the plaintiff denied experiencing any pain from the tooth, whatsoever, but insisted that his hip was in pain. *Id.* On October 18, 2011, after reviewing plaintiff's chart, Dr. Lavaria noted "degenerative changes" on plaintiff's lumbar and hips, and recommended an MRI and consultation with an orthopedist to determine that whether plaintiff was "a candidate for hip [replacement] surgery." *Id.* at 3-5; Rec. Doc. 11-3 at 29, 32.

On October 20, 2011, defendant Carter responded through defendant, Warden Robert Tanner, to plaintiff's ARP. Rec. Doc. 1 at 42. Defendants denied that there was any documentation that plaintiff was scheduled to see an orthopedic doctor. *Id.* In addition, they claimed that plaintiff's request for a wheelchair at Hunt had been denied outright. *Id.* They summarized plaintiff's care at the hands of Dr. Lavaria and concluded that no relief was warranted for his ARP. *Id.*

On October 24, plaintiff filed the second step of his ARP, again complaining of both the pace of treatment and the fact that his day entailed too much standing and walking. Rec. Doc. 1 at 41. The same day, Dr. Robert Starnes restricted plaintiff's duty status for 24 hours to limit

bending, squatting, stooping, and lifting and restricted him to inside the compound. Rec. Doc. 11-1 at 38.

On November 7, 2011, Plaintiff received an MRI. Rec. Doc. 11-3 at 31. The report, dictated by Dr. Jigar Patel, notes several findings in the areas scanned. Rec. Doc. 11-2 at 17. First, there are "severe degenerative changes" at plaintiff's right hip joint, with "joint space narrowing, osteophyte formation, slight cortical irregularity, and subchondral cystic changes." *Id.* Second, there is "bone marrow edema" in the right femoral neck (i.e., the part of the leg that connects to the hip), with the "possibility of a femoral neck stress fracture." *Id.* Third, there is "only a small amount of right hip joint fluid." *Id.* Fourth, there are possible tears at both the right and left labra. *Id.* Finally, there is left hip joint effusion. *Id.* The header of this report indicates that it was faxed from Dr. Patel to Dr. Lavaria. Although the cover page is not included in the records, the date "11/9/11" is written next to what appears to be Dr. Lavaria's signature on the second page of the report. Rec. Doc. 11-2 at 18.

On November 15, 2011, an orthopedist, Dr. Marrero, evaluated plaintiff via "telemed," and recommended that plaintiff undergo onsite orthopedic consultation at LSU Hospital. Rec. Doc. 11-3 at 11, 28.

On January 19, 2012, plaintiff made a routine sick call complaining of hip and leg pain after being forced to stand for too long during roll call. Rec. Doc. 11-3 at 6. The record shows that plaintiff asked about the possibility of a hip replacement at that time. *Id.* Although the screener referred plaintiff to a doctor, the records do not reflect that he was seen. *Id.* The same day, the Secretary of Public Safety and Corrections responded to plaintiff's second-step ARP, denying it as unmeritorious based on a controlling medical opinion. Rec. Doc. 1 at 40.

7

On January 20, 2012, plaintiff sent a letter to defendant Carter, stating that his MRI revealed the need for surgery, that his prescribed medications were not effective, and that he was still being forced to endure painful standing and walking on a daily basis. *Id.* at 39. Presciently, plaintiff also expressed concern that Dr. Lavaria's departure on January 26, 2012 would further delay his hip treatment. *Id.* On January 26, Carter wrote back stating that the requested appointment for orthopedic consultation had yet to be confirmed and that she could do nothing about his medication. *Id.* at 38.

On February 3, 2012, plaintiff was screened for a reduction of his duty status but denied because he was already on restrictive duty status. Rec. Doc. 11-3 at 5.

On February 19, 2012, plaintiff sought judicial review of the denial of his second-stage ARP from the Nineteenth Judicial District Court. Rec. Doc. 1 at 32. In addition to Eighth Amendment liability, plaintiff's state court petition sought in camera inspection of his medical records and protection against retaliation. *Id.* at 30.

On March 2, 2012, plaintiff had an off-site, orthopedic consultation at LSU-Health Care Services Division (HCSD) in Baton Rouge, with Dr. Alan Hurt, who determined that the hospital was "unable to provide surgical intervention for right hip replacement at this time." Rec. Doc. 11-3 at 3-4 (emphasis added). No reason for this determination is given in the records themselves. Dr. Hurt recommended Celebrex and the use of a walker as opposed to a cane, and a follow-up appointment in 6 months. *Id.*

On March 8, 2012, plaintiff again requested a "status reduction" that was again denied because of plaintiff's already restrictive status. Rec. Doc. 11-3 at 1. On March 9, 2012, Dr. McVea prescribed plaintiff a donut cushion, a walker, and Mobic as a substitute for Celebrex.

Rec. Doc. 11-2 at 30, 33. Dr. McVea made the restrictions on plaintiff's duty status - compound inside fence, bottom bunk, no prolonged standing/walking, etc. - permanent. Rec. Doc. 11-1 at 37.

On July 25, 2012, the Nineteenth Judicial District Court dismissed plaintiff's lawsuit without prejudice and/or service on defendants for failure to state a claim for declaratory relief that is available in that court and failure to file delictual claims in the mandatory venue or format for an ordinary suit. Rec. Doc. 1 at 17.

On July 30, 2012, plaintiff saw Dr. McVea. Rec. Doc. 11-2 at 29. The records of that visit contain a handwritten exchange, presumably between the two. First, by plaintiff:

> Doctor, there is a lot of thing's[sic] I don't understand[.] My hip is getting worse and now the left one is cramping up on me in the back of my hip, and the right one that [w]hole leg just drag[s] sometime[s] and the hip hurt inside my cro[tch] area bad also[.] I don't know if the wheel chair will help or not because I don't want the hip to lock up on me[.] I am suppose[d] to go back to universal Sept. 1st.

*Id.* at 32. In response to this: "Yes, you have an orthopedic follow-up soon. <u>I agree that you need hip surgery, but its[sic] not my decision to make</u>. It's the LSU doctor's. Do you feel like you would like to try a wheelchair? your current meds aren't providing enough relief?" *Id.* (emphasis added). In response to this: "OK but when I go back, will the MRI? See[,] they ask me last time where is the MRI from LSU Bogalusa, Nov. 7 2011." *Id.* The disposition of that visit shows Dr. McVea's notations to himself, "Request [follow up] ortho appt - as prev. requested" and "Get MRI . . . on chart." Rec. Doc. 11-2 at 29. Dr. McVea finally updated plaintiff's duty status to reflect that he should sit to work and use a wheelchair. Rec. Doc. 11-1 at 36. Plaintiff has testified that he did not receive his wheelchair <u>until February 26, 2013.</u>[2]

---

[2]The pleadings in this case indicate, somewhat confusingly, that he was "issued" a wheelchair by the time this law suit was filed in December 2012. Rec. Doc. 1 at 9. However, drawing

On September 24, 2012, plaintiff made a routine sick call, complaining that his hip was hurting "more and more," and that it hurt even when he sat and lay down. Rec. Doc. 11-2 at 28. He advised that the change in his medication had not helped the pain. *Id.* He asked to know the status of his surgery, believing that he had been scheduled for a follow-up appointment on September 1, 2012. *Id.* He again advised the medical staff that LSU-HCSD wanted a copy of the MRI performed on November 7, 2011 to assess his need for hip replacement surgery. *Id.*

On October 11, Dr. McVea referred plaintiff back to LSU-HCSD for another off-site orthopedic evaluation. Rec. Doc. 11-2 at 25, 27. There is no indication that this evaluation ever took place. Instead, on November 26, 2012, plaintiff was seen <u>again</u> by Dr. Marrero via telemed, who <u>again</u> recommended an orthopedic clinic appointment to <u>again</u> evaluate for surgery. *Id.* at 21-22. Apparently, the fact that plaintiff did not go back to LSU confused him enough to write Nurse Carter again; Nurse Carter responded that Dr. Marrerro's offsite referral "ha[d] been requested." Rec. Doc. 1 at 35.

On January 3, 2013, plaintiff made a routine sick call stating that the Mobic/Ultram he had been prescribed were not helping his hip pain, and that his hip pain was becoming worse. Rec. Doc. 11-2 at 20. Plaintiff claimed he was in pain every time he moved. *Id.* Plaintiff's medical records end on this date; however, plaintiff testified that he received no additional treatment as of April 30, 2013, save a wheelchair he was given on February 26, 2013.

**II. Procedural History**

On December 17, 2012, plaintiff filed the instant lawsuit in federal court. Rec. Doc. 1 at 14-15. Per Local Civil Rule 73.2(A), this matter was referred directly to the Magistrate Judge.

---

inferences in plaintiff's favor, the Court concludes that issuance refers only to the actual prescription for the chair as opposed to the receipt of it.

On January 15, 2013, the Court ordered that defendants disclose a verified copy of plaintiff's medical records. Rec. Doc. 4. On April 30, 2013, the Magistrate Judge conducted, with considerable difficulty,[3] a telephonic hearing pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). Rec. Doc. 16. During the hearing plaintiff confirmed that his complaint was confined to defendants' failure to furnish hip replacement surgery. He testified that he continues to suffer pain in his hip, despite being able to sit in a wheelchair. He further testified that he can no longer walk.

At the conclusion of the hearing, the Magistrate Judge ordered a physical examination pursuant to Fed. R. Civ. P. 35 to be conducted by an orthopedic specialist at University Hospital in New Orleans. Rec. Doc. 16. The Magistrate Judge further ordered defendants to provide an affidavit explaining their failure to provide plaintiff with surgery and establish a briefing schedule for a motion for summary judgment after the Rule 35 examination took place. *Id.* at 2.

The report of Rule 35 examination, conducted on May 17, 2013, has been filed into the record. Rec. Doc. 19. At the examination, plaintiff presented with complaints of hip and shoulder pain, with the right hip being most severe. X-rays were taken of both areas. As in the past, x-ray of the right hip revealed, "severe [degenerative disease] with complete loss of joint space, bone-on-bone articulation, and subchondral cyst formation." *Id.* at 1. The resident and physician further examined plaintiff and noted the lack of deformities, numbness, or apparent inability to bear weight. *Id.* at 2. Based on their examination, the doctors determined that plaintiff "could

---

[3] Plaintiff testified by writing messages to an interpreter who was also sworn by the Magistrate Judge. The audio recording of the hearing reveals that the interpreter was difficult to understand at times.

certainly benefit from surgery for a right total hip replacement," insofar as it "would most likely help improve his function and decrease pain." Their report continues:

> The procedure is not medically necessary, as the condition is not life threatening, but it would improve his quality of life. Unfortunately, due to current state budget cuts and limited operating room availability, the ability to perform elective surgery at University Hospital (ILHNO), especially a hip replacement, is very limited. The orthopaedic service currently has trouble scheduling the operating room time for in-house trauma patients that require surgery more urgently. Therefore, it may take several years to get his surgery scheduled and completed. I cannot give him a more specific timeframe today. In the meantime, I recommend he continue Meloxicam 15 mg PO daily for pain control. He will follow up in Ortho clinic in 3-4 months for repeat examination.

*Id.* at 2; *see also id.* at 1 (concurring in findings).

Defendant's motion for summary judgment followed on July 24, 2013, with plaintiff opposing on November 29, 2013. The Magistrate Judge filed his Report and Recommendations on December 20, 2013.

## III. Standard of Review

When a magistrate judge makes recommendations for the disposition of a inmate challenge to conditions of confinement, the district court is required to review inmate objections under a *de novo* standard. 28 U.S.C. § 636(b)(1)(B)-(C). Accordingly, the Court's review of the plaintiff's objections is governed by the same legal standards that applied to the Magistrate Judge's determinations in the first instance.

A. Summary Judgment

Summary judgment is appropriate where "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the

12

district court of the basis for its motion, and identifying those portions of '[discovery], together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the mover satisfies that initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial" using evidence cognizable under Rule 56. *Id.* at 324, 106 S. Ct. at 2253. Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The nonmoving party may also survive summary judgment by "showing that the materials cited [by the mover] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(B).

When considering whether any genuine issues of material fact exists, courts view the evidence and inferences drawn from that evidence in the light most favorable to the non-moving party. *Daniels v. City of Arlington, Texas*, 246 F.3d 500, 502 (5th Cir. 2001). Summary judgment does not allow a court to resolve credibility issues or weigh evidence. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)."[S]o long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Id.*

A trial court should act with caution in granting a motion for summary judgment and may deny it in any case "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

B. Qualified Immunity

13

Qualified immunity serves to shield a government official from liability based on the performance of his or her discretionary functions. *Beltran v. City of El Paso*, 367 F.3d 299, 302-303 (5th Cir. 2004). Government officials are entitled to qualified immunity to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). To invoke qualified immunity, "a government official must first show that the conduct occurred while he was acting in his official capacity and within the scope of his discretionary authority." *Beltran*, 367 F.3d at 303.

Once the defense has been properly invoked, the burden is on the plaintiff to show its inapplicability. *Id.*; *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). "[A] plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) *cert. denied*, 132 S. Ct. 2740, 183 L. Ed. 2d 614 (2012) and *cert. denied*, 132 S. Ct. 2740, 183 L. Ed. 2d 614 (2012) (citations omitted) (internal quotation marks omitted). After *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), a court has discretion to consider these prongs in either order when qualified immunity is raised.

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (citations omitted) (internal quotation marks omitted). To analyze this prong, a court must determine "whether the law so clearly and unambiguously prohibited [an official's] conduct that every reasonable

14

official would understand that what he is doing violates [the law]." *Morgan*, 659 F.3d at 371. To conclude that this requirement is satisfied, a court "must be able to point to controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity." *Id.* at 371-72.

> Although the Supreme Court has repeatedly admonished courts not to define clearly established law at a high level of generality, this does not mean that "a case directly on point" is required. Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." The sine qua non of the clearly-established inquiry is "fair warning." Thus, [a court] must ask "not only whether courts have recognized the existence of a particular constitutional right, but also ... whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct."

*Id.* at 372.

C. Cruel and Unusual Punishment

The Eighth Amendment's ban on Cruel and Unusual Punishment prohibits, among other things, those punishments which, "although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S. Ct. 2909, 2924, 49 L. Ed. 2d 859 (1976)). Deliberate indifference to serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)."This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* "[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). However, even where such harm is

15

absent, an inmate may recover for pain suffered during the period of time that treatment was delayed. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

The test for such an Eighth Amendment violation has two components. The first, objective component requires a deprivation "sufficiently serious" to "result in denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994). An inmate must prove exposure to conditions posing a "substantial risk of serious harm." *Id.* "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992) (citing *Estelle*, 429 U.S. at 103-104, 97 S. Ct. at 290-291). It does not follow, however, that only life-threatening conditions are actionable under the Eighth Amendment; rather, the Supreme Court has long recognized that the scope of cognizable medical needs range from those which "may actually produce physical torture or a lingering death," to those "less severe" which "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103, 97 S. Ct. at 291. "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 352 n.12 (5th Cir. 2006).

The second, subjective component asks whether the inmate has demonstrated the requisite state of mind on the part of the actor he seeks to hold liable. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or

16

safety[.]" *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This limitation places ordinary malpractice, negligence, disagreements about care, and other decisions backed by "medical judgment" beyond the reach of the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Gobert*, 463 F.3d at 346. Where, as here, an inmate seeks to hold several individuals liable, each individual's subjective deliberate indifference must be examined separately. *Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002).

D. Pro Se Litigation

Documents filed by pro se litigants must be construed liberally and held to a less stringent standard than those filed by represented parties. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). This does not relieve a pro se plaintiff of any burden imposed on him by the summary judgment procedure. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir.1992); *see also Ogbodiegwu v. Wackenhut Corrections Corp.*, 202 F.3d 265 (5th Cir. 1999) (unpublished table opinion). He must raise arguments capable of withstanding summary judgment. *See Martinson*, 975 F.2d at 193. Any evidence relied upon to resist summary judgment must further be admissible. *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980). When considering a pro se plaintiff's opposition to summary judgment, a court need not supply or consider arguments not raised therein. Nevertheless, as in any motion for summary judgment, the court retains discretion under Rule 56 to consider portions of the record not specifically cited by either party. Fed. R. Civ. P. 56(c)(3).

**IV. Analysis**

To the extent that plaintiff provides coherent objections to the Magistrate Judge's Report and Recommendation, they center on his willingness to accept the defendants' argument that their responses to his medical needs suffice to defeat any showing of deliberate indifference. Rec. Doc. 24, ¶ 3. Plaintiff argues that he is not required to show that defendants literally ignored him, as long as it can be shown that they consciously disregarded serious medical needs. *Id.*, ¶ 5. He notes that while the Magistrate Judge rested his opinion on state budget concerns, the need for surgery to alleviate the pain that he described as unbearable in his complaint is undisputed. *Id.* at 2. These objections have merit that cuts across the Magistrate Judge's determination of various issues in this case.

The contentions raised in defendants' motion for summary judgment are three-fold. First, they argue that any showing of deliberate indifference is foreclosed by defendants' responsiveness to plaintiff's condition. Rec. Doc. 21-2 at 12-20. Next, they argue that they are entitled to qualified immunity because none of the defendants acted unreasonably in light of the clearly established federal law. *Id.* at 20-23. Finally, Warden Tanner argues that judgment should be entered in his favor because the plaintiff either proceeds against him in his individual capacity under respondeat superior or in his official capacity, neither of which theories is cognizable under 42 U.S.C. § 1983. *Id.* at 23-25. In his report and recommendation, the Magistrate Judge relied on the first two arguments, without reaching the third. Rec. Doc. 23.

A. Deliberate Indifference

Defendants first defy plaintiff to show conduct on their parts evincing deliberate indifference to his medical needs, serious or otherwise. Based on the precedents summarized

above, plaintiff will be able to show deliberate indifference to his medical needs,[4] whenever he can show that the defendants ignored or refused a request for intervention related to his hip that was either recommended by a doctor or would have been obviously necessary to a lay person. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Gobert*, 463 F.3d at 352 n.12.

Broadly speaking, plaintiff's claims against the defendants fall into two categories. The first is that they short-circuited or undermined the referral process for his hip replacement consultations. Thus, defendants' argument throughout their motion for summary judgment that they cannot be liable because plaintiff was never recommended for surgery is of no moment. A significant portion of plaintiff's allegations against defendants are that they prevented him from obtaining a surgical recommendation.

The second kind of claim raised in plaintiff's complaint is that defendants, Nurse Carter in particular, ignored requests to further restrict plaintiff's duty status to prevent him from having to stand and walk to the point of severe pain and additional damage to his hip. The Magistrate Judge attempted to dispose of these claims by asking plaintiff whether his only cause of action was related to the ongoing need for hip replacement surgery. Rec. Doc. 23 at 4.[5] Plaintiff did not seemingly catch onto this until his opposition to summary judgment, where he insisted that he was claiming for a wider range of care issues. Rec. Doc. 22, ¶ 6. Insofar as the Court would accept plaintiff's answer at the *Spears* hearing as a voluntary dismissal of part of

---

[4] The Court will address whether plaintiff's condition constitutes a "serious medical need" in the next section.

[5] The Court does not, by this observation or any other made in this order, mean to imply that the Magistrate Judge conducted this case inappropriately. An attempt to hold a plaintiff, incarcerated or not, to a particular theory of his case is typically justified by the need to conserve resources. But for plaintiff's manifest difficulties communicating, the Court would be willing to hold plaintiff to the dismissal of his claims in this case as well.

his complaint, it is equally apt to reinstate the portion previously dismissed based on the statement in his opposition to summary judgment. Therefore, the Court will analyze the second category of plaintiff's claims. As will be explained below, the medical records produced by defendants support both categories.

*Nurse Bessie Carter*

Defendants contend that plaintiff cannot show that Nurse Carter acted or failed to act with deliberate indifference because, as the Director of Nursing for Rayburn, she had no personal involvement in his treatment, and because she responded to plaintiff's letters and ARP promptly with relevant information. Rec. Doc. 21-2 at 13-15. However, these arguments do not address the general thrust of plaintiff's allegations against Nurse Carter.

Plaintiff first claims that Nurse Carter expressly ignored his attempt to advise her that he had been scheduled for off-site orthopedic consultation at LSU in Baton Rouge before his transfer to RCC, the fact that she issued prompt responses is irrelevant. *See* Rec. Doc. 1 at 11. Plaintiff's complaint includes Offender Correspondence from Phelp's Director of Nursing advising him of an orthopedic referral. *Id.* at 54. At the bottom of this letter is a handwritten note: "P.S. I had x-rays taken at L.S.U. in Baton Rouge." *Id.* Liberally construing his complaint, plaintiff incorporated a copy of this letter in his first letter to Nurse Carter along with his consent to release records from that hospital. *Id.* at 52. While the medical records corroborate the authenticity of plaintiff's letter and his recollection of events, *see* Rec. Doc. 11-4 at 20, Nurse Carter stated expressly in her letter to plaintiff that she reviewed his records and determined that he had no referral. Rec. Doc. 1 at 42. Because plaintiff's records lack a clear indication of a referral, Nurse Carter's behavior forecloses the possibility deliberate indifference. Plaintiff

cannot recover for Nurse Carter's failure to, for instance, contact the Phelp's nurse before determining that he had no referral to LSU.[6]

Plaintiff also claims for Nurse Carter's refusal to transfer his duty status from Hunt to give him a fixed time-limit for walking and standing. Rec. Doc. 1 at 6. This suffices to state a claim for an Eighth Amendment violation because it would have been obvious to a lay person with a knowledge of plaintiff's treatment history that forcing him to stand, walk, and "ambulate" on foot placed him at excessive risk for stress fractures in the bones that connect the femur to the pelvis at the right hip and compensating injuries in the left. Indeed, it appears that plaintiff already suffered such a stress fracture. Rec. Doc. 11-2 at 17.  When plaintiff requested to have his status corrected via letter on January 20, 2012, he cited to evidence that had not been in Dr. Lavaria's possession when he initially set plaintiff's duty status, i.e., his November 7, 2011 MRI which revealed damage to his hip joint and connective tissue. Rec. Doc. 1 at 39. From this it is plausible that Nurse Carter could have and did infer that mere restrictions on "prolonged" standing and walking would not allow plaintiff to avoid future pain and damage, especially in light of his inability to vocalize pain.

Defendants do not contend that Nurse Carter lacked the ability to influence this facet of plaintiff's treatment. Moreover, the records show that screening nurses routinely considered plaintiff's duty status. Rec. Doc. 11-3 at 1, 3. Furthermore, while Nurse Carter denied the ability to influence plaintiff's prescriptions and offsite referrals, she has never denied her control over duty status. Rec. Doc. 1 at 36-37. Based on the foregoing, a reasonable fact-finder could conclude that Nurse Carter had control over this aspect of plaintiff's treatment. The Court will

---

[6]Such a claim would be better directed toward whomever at Phelps was responsible for charting plaintiff's outside referrals.

not enter summary judgment on this claim without allowing discovery to take place or the presentation of insurmountable evidence that defendant was not deliberately indifferent with respect to this particular conduct.

Finally, because plaintiff has sought to hold Nurse Carter liable for any intentional delays in the referral process, Rec. Doc. 1 at 9, and has included correspondence related to the scheduling of a follow up at LSU-HCSD, *id.* at 35, the Court finds that plaintiff has attempted claim for Nurse Carter's failure to schedule a follow-up appointment at LSU-HCSD based on Dr. McVea's referral in October 2012. The evidence indicates that the scheduling of offsite appointments was within the purview of the Director of Nursing. Rec. Doc. 1 at 35. Moreover, the Court finds that any Eighth Amendment violation is potentially ongoing because Dr. McVea made it clear in his notes that his recommendation was for plaintiff to be evaluated by an orthopedic surgeon <u>with the results of the MRI conducted in November 2011</u>. Rec. Doc. 11-2 at 29. The court-ordered Rule 35 examination makes it clear that the doctors did not consider the results of any MRI examination. Rec. Doc. 19 at 1. More frustratingly, there is no indication that the doctors were even aware that plaintiff's previous treating physicians had ordered and interpreted an MRI before referring him to an outside consultation. *Id.*

In light of the foregoing, Nurse Carter's asserted lack of deliberate indifference only affords a partial basis for summary judgment. Plaintiff's complaint can move forward as set forth above.

*Dr. Dennis Lavaria*

Defendants argue that Dr. Lavaria cannot be liable because he was responsive to plaintiff's pain complaints in other manners. Plaintiff claims against Dr. Lavaria for imposing

intentional and painful delays in his ultimate quest for hip replacement surgery. Plaintiff

primarily alleges that Dr. Lavaria "maliciously dropped [his] care" after making referrals for

orthopedic consultation and MRI imaging and before departing RCC on January 26, 2012. Rec.

Doc. 1 at 7. The records support this claim.

On October 18, 2011 after reviewing plaintiff's x-rays, Dr. Lavaria referred plaintiff for

his MRI and orthopedic consultation. On October 20, 2011, defendants Carter and Tanner

responded to plaintiff's ARP regarding his daily standing and walking requirements, by telling

him that Dr. Lavaria had already given him a "very restrictive duty status." Rec. Doc. 1 at 42. On

November 7, 2011 plaintiff received an MRI which revealed much more than the arthritic

degeneration or narrowing of joint space, which had prompted his initial referral. Rather,

plaintiff had a possible "femoral neck stress fracture" and possible tears in the connective tissue

around his hip. Rec. Doc. 11-2 at 17. Dr. Lavaria apparently acknowledged receipt of the MRI

with initials. *Id.* at 18. On January 19, 2012 plaintiff made his first and only attempt to advise Dr.

Lavaria that the duty status he had been given was not working to prevent pain or deterioration

of his condition. Rec. Doc. 11-3 at 6. However, Dr. Lavaria did not see plaintiff at all on that

referral. This omission only fails to qualify as deliberate indifference if, for some reason, Dr.

Lavaria was not apprised of his screener's referral. This is Dr. Lavaria's defense to assert, and he

has not done so. For the time being, plaintiff's contention that Dr. Lavaria was intentionally

trying to "pass the buck" onto his successor is plausible in light of the fact that Dr. Lavaria was

responsive to every other one of plaintiff's previous sick calls. No summary judgment is yet

warranted on this issue.

23

Dr. Lavaria's failure to "chart" the results of plaintiff's MRI so that they would be available during plaintiff's off-site orthopedic consultation also begs some explanation. However, as plaintiff has not sought to recover on this basis, the Court will not consider it.

*Dr. Casey McVea*

As with Dr. Lavaria, defendants focus the Court's attention to Dr. McVea's willingness to prescribe medicine and to make referrals. Plaintiff claims against Dr. McVea both as Dr. Lavaria's "successor" and for denying or interfering with referrals for outside treatment. *See* Rec. Doc. 1 at 10. By "successor" plaintiff can only be referring to an official capacity suit against the Medical Director of Rayburn, which he has not instituted. As to the claims of denial and interference with the referral process, they are weaker than the claims made against Nurse Carter and Dr. Lavaria, although still plausible. While under Dr. McVea's care, plaintiff missed his follow-up consultation with LSU-HSCD. Dr. McVea had discussed the appointment with plaintiff in a detailed writing but waited until one month after the original follow-up date to even try to re-refer plaintiff. Thereafter, plaintiff started all over again with Dr. Marrero. It is possible that this was an oversight, indicating ordinary negligence rather than deliberate indifference. Nevertheless, this is Dr. McVea's defense to assert, and he has not thus far. Therefore, no dismissal is yet warranted.

B. Qualified Immunity

In addition to individually arguing their lack of deliberate indifference, defendants argue that their behavior collectively was reasonable in light of precedents that generally recognize that an inmate is not entitled to hip replacement surgery simply because he insists on it. Rec. Doc. 21-2 at 20. They argue, assuming that plaintiff's medical needs were constitutionally serious, it

was objectively reasonable for defendants to determine that they had discharged their

constitutional obligations through the attention they gave it.

As an initial matter, unlike the Magistrate Judge,[7] this Court has no trouble concluding

that plaintiff's total lack of right hip cartilage constituted a serious medical need under clearly

established federal law at the time of this incident. The Court's independent research reveals no

controlling precedent directly on point. Nevertheless, the Fifth Circuit has stated that medical

needs are serious when an inmate obtains specific treatment recommendations. *Gobert*, 463 F.3d

at 352 n.12. *Estelle v. Gamble*, a seminal case on "serious medical needs" makes clear that a

medical condition is of the serious nature contemplated by the Eighth Amendment so long as

"unnecessary and wanton infliction of pain" results as a consequence of denial or delay in the

---

[7]     The Magistrate Judge has questioned whether plaintiff's degenerative joint disease can be considered to create an "excessive risk to [his] health and safety"under precedents clearly established at the time of these incidents. For this argument he cites *Lusk v. Dallas County Sheriff's Dep't*, 00-0622L, 2002 WL 31757706 (N.D. Tex. Nov. 29, 2002) and *Giddings v. Valdez*, 06-2384G, 2007 WL 1201577 (N.D. Tex. Apr. 24, 2007).

    In *Lusk*, the inmate claimed damages for a herniated disk and degenerative spinal condition which caused him a great deal of pain during a contraband shakedown. 2002 WL 31757706 at *2. Although the District Court concluded that Lusk's condition did not create a serious or excessive risk to the inmate's health, *id.*, the facts of this case are sufficiently distinct to prevent *Lusk* from casting doubt on the application of well-settled precedent to the facts of this case in the minds of a reasonable official.

    In *Giddings*, the plaintiff attempted to claim for a degenerative condition of the hips. 2007 WL 1201577 at *2. There, the Magistrate Judge concluded that such a condition was not serious because it is not life-threatening. *Id.* The Court finds this reasoning irreconcilable with clearly established, controlling precedent. In any case, the "medical needs" in this case and *Giddings* are distinct despite having a common cause. *Giddings* was claiming for the disease itself. The Magistrate Judge clearly found, or assumed, that the Giddings' condition only affected his ability to "ambulate comfortably." *Id.* at *2. By contrast, plaintiff's disease has already done its work on his body. Plaintiff's current medical needs amount to the disease's after-effects: lack of any cartilage or space in his hip, along with any stress fractures or labral tears he has incurred along the way.

    In any case, the Court would not adopt this argument as a basis for granting summary judgment because defendants did not raise it in their motion.

provision of adequate treatment. 429 U.S. at 103, 105, 97 S. Ct. at 290, 291. The Fifth Circuit has recognized that a medical condition will create an excessive risk of harm to inmate health or safety when it leaves the inmate in "extreme" or "excruciating" pain, even if life-threatening consequences are absent. *Perez v. Anderson*, 350 F. App'x 959, 961 (5th Cir. 2009). Plaintiff was recommended for surgical consultation in light of his inability to obtain relief for the extreme pain he suffers through nonsurgical means. Indeed, his initial referral for consultation came when his hip hurt so badly that he was not experiencing any pain from his broken tooth. Rec. Doc. 11-4 at 5. This suffices to meet the Fifth Circuit test.[8]

Fifth Circuit case law addressing hip degeneration has further acknowledged that such a condition can become "serious" enough to render surgery "medically necessary" and therefore warrant Eighth Amendment scrutiny. *Cf. McBarron v. Federal Bureau of Prisons*, 332 Fed. App'x 961, 964 (5th Cir. 2009). A reasonable official considering *McBarron* would recognize that a degenerative hip condition can progress into something more "serious" which would require medical intervention under the Eighth Amendment. Every doctor in this case has acknowledged that plaintiff's hip condition is as bad as they come. The Fifth Circuit has also assumed for the sake of its rulings that compression stress fractures in leg bones, which plaintiff appears to have, merit Eighth Amendment scrutiny. *Ramirez v. Stacks*, 260 Fed. App'x 658 (5th Cir. 2007). The defendants in this case do not even contend that they would have been justified in ignoring plaintiff's condition altogether, which is the logical corollary of the conclusion that his medical needs were not serious.

---

[8]Other circuits have adopted a test for seriousness that turns on whether denial or delay of treatment would impose "life-long handicap or permanent loss" to the inmate. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citing cases). Plaintiff claims to have sustained just such a loss as a result of the failure to treat in this case.

The defendants only argue that their actual response to plaintiff's medical needs was objectively reasonable based on clearly established constitutional law. Their argument assumes that plaintiff is simply claiming damages for the speed or urgency with which he is being given hip replacement surgery. Clearly, this alone is not actionable under the Eighth Amendment. *See McBarron*, 332 Fed. App'x at 964. However, this argument is a straw man. As stated above, plaintiff's only claim related to the speed of hip replacement surgery is that the defendants intentionally and arbitrarily refused to take him to offsite referrals which were in fact deemed necessary and ordered by prison physicians. This suffices to show "intentionally . . . delaying access to medical care or intentionally interfering with the treatment once prescribed" for purposes of the Eighth Amendment. *Estelle*, 429 U.S. at 104-105, 97 S. Ct. at 291. Under these circumstances, the Court will require the defendants to file affidavits denying that they had the requisite intent, before considering the prospect of summary judgment.

That defendants have finally, under Court order, taken plaintiff to surgical consultation after his re-referral by Dr. McVea does not preclude plaintiff's ability to claim for past deliberate indifference. Moreover, the Court attaches no constitutional weight to the conclusion stated in the Rule 35 report that hip replacement surgery is not "medically necessary" for plaintiff because it does not threaten his life. Rec. Doc. 19 at 2. However useful this standard might be in other arenas, it is simply not the test for whether an Eighth Amendment violation has occurred.

As previously stated, the Court is disturbed by defendants' behavior insofar as it appears that even now, they have not provided the consulting surgeons with plaintiff's MRI or other impressions about the progress of his condition. As plaintiff suffers from the inability to vocalize

his pain or carry on extended conversations with care providers, this is particularly egregious even if it proves not to be unconstitutional.

C. Warden Robert Tanner

Defendants argue that Warden Tanner is entitled to dismissal because plaintiff plainly relies on a respondeat superior theory that is not cognizable under 42 U.S.C. 1983. Rec. Doc. 21-2 at 23-24. Unlike defendants' other attempts to characterize plaintiff's complaint, this assessment rings true. *See* Rec. Doc. 9 at 1. The doctrine of respondeat superior does not apply in any suit brought under 1983. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). To maintain a claim against Warden Tanner in his individual capacity, plaintiff must identify a specific act, for which Warden Tanner is personally responsible. *Alton v. Texas A & M University*, 168 F.3d 196, 200 (5th Cir.1999). Alternatively, plaintiff can maintain an action against Warden Tanner in his official capacity if it is shown that official policy or custom has contributed to a violation of his federal rights. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 362, 116 L. Ed. 2d 301 (1991). It seems likely that the defense urged by the individual defendants will implicate this theory of liability. Nevertheless, the Court will dismiss the claim against Warden Tanner without prejudice to an attempt to reinstate on different grounds.

D. Entitlement to Hip Replacement Surgery

The Court notes that plaintiff has not yet requested this Court to enjoin the defendants to provide him hip replacement surgery, even though plaintiff maintains his entitlement to receive such surgery and much time has been spent considering the merits of a potential claim of this nature. *See* Rec. Doc. 1 at 3, 13. If plaintiff would like this Court to rule or his entitlement to receive hip replacement surgery, he must amend his pleadings to request the appropriate remedy.

28

In so doing, plaintiff should also consider the appropriate party for his cause of action. As the record stands, there is no dispute that the prospective surgery-provider is the current obstacle to surgery. Insofar as it constitutes a "state actor," a hospital may be liable to plaintiff to the same degree as a doctor directly employed by the prison for violating plaintiff's Eighth Amendment rights. *See West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988); *Loosier v. Unknown Medical Doctor*, 435 Fed. App'x 302 (5th Cir. 2010).

Finally, by way of clarification, the foregoing analysis has not considered plaintiff's argument that defendants' failure or delay in giving him hip replacement surgery has or would violate his Eighth Amendment rights <u>specifically because</u> he is willing and able to pay for the surgery. Plaintiff has not alleged that any of the defendants unconstitutionally ignored, disregarded, or interfered with his ability to expedite matters by funding his own treatment.[9] The Court will consider this issue as it relates to plaintiff's prospective entitlement to hip replacement surgery, if he chooses to amend his complaint to request such relief.

Therefore, IT IS ORDERED that defendants' Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. Rec. Doc. 21.

New Orleans, Louisiana, this 5th day of  March, 2014.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

---

[9] It is not entirely clear that plaintiff's willingness or ability to pay is relevant to the scope of his Eighth Amendment rights. *See Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 336-337.